Good morning. We'll begin with the case and the caption of which I will abbreviate as being C.G. versus the Commonwealth of Pennsylvania Department of Education. And to make sure that I'm pronouncing your name correctly, is it Mr. Quisenberry? Mr. Quisenberry. My name is Kevin Quisenberry. I represent the appellants today. My co-counsel is Evelyn Welling. And if I may, with the court's permission, I'd like to reserve three minutes for rebuttal. Thank you. Your Honors, in this case, the court below erred in two fashions. First, by failing to analyze appellants' ADA and Section 504 discrimination claims separately from their IDEA fake claims. And secondly, by failing to enter judgment for the appellants on their ADA and their 504 discrimination claims. Before we get to argument on the errors that you assign with respect to the district court's opinion following trial, a couple of preliminary questions that I have just for a better understanding of this. First of all, this is a class action, as I understand it, with two subclasses? Yes, Your Honor. It was presented as two subclasses. I believe the court certified two separate classes. But functionally, I believe it would be the same. And was there a challenge by the Commonwealth to the motion to certify the classes here? Yes, Your Honor, there was. That answers that question. The other more fundamental question for our purposes here, since what I understand you're pursuing on appeal are only the ADA and Rehab Act issues. What, in your theory of liability under the Acts here, is the interaction between the IDEA and the ADA and RA? Yes, Your Honor, I think the Tustin court in the Ninth Circuit got it pretty correctly. I believe the analysis in that case was akin to the analysis that we've presented in our briefing to the court on these issues. The IDEA establishes a floor, a substantive floor of education that every special education student is entitled to who lives in a state, in a district that receives IDEA money. And affords a remedy to every individual student who may claim that he or she is being denied FAPE. A free appropriate public education. Your Honor, the 504 regulations have their own FAPE requirement. ADA does not have a FAPE requirement. But you need to take a step back to look at ADA and 504 as anti-discrimination statutes, which they are. They prohibit much broader forms of discrimination than the IDEA is designed to address. And that form of discrimination that you're claiming here is simply a disparity in supplemental special education funding among various school districts throughout the Commonwealth? In a manner of speaking, Your Honor. There are no school districts, though, who are parties to this litigation? No, Your Honor. It's the students in the districts. Well, that brings me then to a fundamental question with respect to the district court's adjudication here, because this was a fairly lengthy opinion. Fifty pages or something? Numerous. Sixty-eight. Sixty-eight pages. Numerous findings of fact. Where are there findings of fact which demonstrate that individual students were impacted because of an inadequate IEP being done on the ground at specific school districts by individual teachers? Well, Your Honor, you're still talking about an IDEA FAPE claim. And the court found that there were no systemic IDEA FAPE violations that result from implementation of this funding formula. We have not disputed that. We have not appealed that issue. The issue that we've appealed is the court wholly disregarded or did not analyze our discrimination claims under the ADA and 504. And it boils down like this. In the U.S. Supreme Court in Alexander v. Choate, which the Ninth Circuit referenced in the Tustin case, the U.S. Supreme Court essentially said that the ADA and 504 do not require that Congress or states or any actors who are regulated by these statutes analyze every action that they take in order to determine whether it will have an impact upon the disabled. Rather, what ADA and 504 require is that when a state or another regulated entity provides a benefit or provides a service or a program, it must ensure that all of those who are eligible to participate and benefit from that benefit or that service or that program have meaningful access to the benefit and equal access to that benefit. Well, but I'm still left wondering what there is at stake here other than unequal funding. Assuming I agree with you that there would be available some remedy under the ADA and the RA in the absence of showing individual or specific violations of the IDEA, how is that discrimination anything other than application of the formula here and the 16 percent? Are you asking, Your Honor, what results occur because of that discrimination or what is the discrimination? Well, the discrimination occurs by way of results, doesn't it? The IDEA requires a basic education. It does not require frills. Now, if one district can give a few more frills than another because of difference in funding, that would not violate IDEA. Would it violate the ADA or the Rehabilitation Act? Your Honor, that's not this case. This case has to do with the state's program, and the state's program in this case is the special education funding program. Pennsylvania does not provide services directly for disabled students. It simply provides funding, which is required to be spent for programs and services. If that funding then to different school districts permits some school districts to offer a frill that another school district cannot offer because of the lower amount of funding, that's not a violation of the IDEA, I gather? As long as students are receiving the bottom line FAPE, that would be correct. Is it a violation of the ADA or the Rehabilitation Act? Yes, Your Honor, but let me restate your question. If the state provides its benefit in a manner that discriminates on the basis of disability, then that state's benefit is being distributed in a discriminatory manner that violates the ADA and 504. Where's the proof in the record here that there is a difference in treatment of these students based on a disability? That that's the motivation or that's the sole reason is the two components of RA and ADA? Sure, Your Honor. It is written right into the statute. The statute has a fiction. The statute has a fiction that 16% of every district is constituted of special education students. We call that fiction, but isn't that a pejorative characterization of an attempt to find some average that has some meaning? You're not contending that 16% is irrational? No, Your Honor, not irrational. It's just not based in reality. And, Your Honor, this is a discriminatory effects case. There are other sources of funding for special education and for students with disabilities, are there not? First of all and most obviously would be local taxation, which contributes to a general fund of a school district. Second of which are the federal funds that are made available. So we can't agree, can we not, that this formula and this special education supplemental funding is not the sole source of revenues? That's right, Your Honor. All right. With that in mind, what's the impact of those various sources of funding on whatever causation you would have to demonstrate with respect to discrimination? Your Honor, the court found causation already. And the court's opinions and findings on that were fully supported by the evidence of record. Causation of what? Well, Your Honor, the court, I'll quote from the court, the court found, the court does acknowledge the substantial evidence presented by Dr. Baker that certain educational outcomes for special education students in the class districts are worse than educational outcomes for special education students in non-class districts. The court finds this information compelling. And indeed, the court acknowledges that his findings would tend to support a hypothesis that children in schools with more available funding tend to achieve better results than students in schools with less available funding. But the court went further to conclude, in sum, the court recognizes that at least some educational disparities may be explained by funding levels. But it's not because of the disabling condition of the students in those schools. It's because of the way the funding formula works. Your Honor, it's because of the frequency of disability in their districts. So as a result, it's where the student goes to school, not because of their disability. No, Your Honor, the cases that have analyzed this sort of question have uniformly found that the argument you're making, that the discrimination is on the basis... I'm asking you a question. I'm asking you a question. I'm not making an argument. I'm asking you a question. Your Honor, can you repeat your question, please? My question is, isn't this finding that you've recited from the district court because of where the students go to school, not because of their... by reason of their disability? No, Your Honor, it is not. Then I'd like to hear your answer to that. No, Your Honor, it is not. As the Tenth Circuit affirmed in Robinson v. Kansas, 117 FSUP, second page is... But Robinson was on a motion to dismiss. It was a general funding formula, right? Yes, it was. It was very similar to this case in that the funding formula resulted in an allocation of the benefit that was disparate on the basis of the frequency of disability in the districts. I think what happened really in Robinson was that the district court said, I'm going to let that claim, allegation go forward for discovery and allow the defendant to try to attack that premise because they didn't want to reject the disparate impact theory, I guess, that was being put forth by those plaintiffs. So isn't that distinguishable from our circumstance where we have a record fully developed where a district court made careful findings based upon the record presented? Where do we get the evidence to show that the funding scheme discriminates based upon or by reason of disability? Your Honor, look at the court's findings of fact, particularly... The ones on test scores performance? No, no, no, number 62 through 69 or thereabouts, where the court analyzes the funding formula and how it operates in effect and finds that because of the manner in which funding is distributed, those schools that have an above average percentage of their average daily membership enrolled in special education tend to receive less special education per student from the commonwealth supplemental education funding. Shouldn't we be talking about is discrimination between or discrimination against a disabled student vis-a-vis what is being provided for a non-disabled student? No, Your Honor, indeed not. And the U.S. Supreme Court was very clear on that in the Olmstead decision. Your Honor, the regulations that DOJ has implemented to carry forward the purpose and prohibitions of the ADA prohibit a public entity in providing any benefit, which in this case is the special education funding, in a manner that affords a qualified individual with a disability an opportunity to participate in or benefit from that benefit that is not equal to that afforded to others. In this case, the inequality results only from the frequency of disability in the district. If you have more disability, you get less funding. And if you have less disability, you get more funding. Does that take into account how the monies are actually administered? Isn't there a possibility, even a likelihood, that some school districts make more efficient use of the funding that's available to them? Your Honor, that's possible, but there are no facts in the record to that effect. I see that my time has expired. Well, I've got some more questions, too, so... You're on our time now, as Judge Becker used to say. Okay. The formula that's used, the 16%, it's a random formula attempting to even things out. Is there a better formula? If you say, all right, we should take the number of disabled students and allot to each school district an amount for each disabled student. Isn't the problem there that the expense of educating a disabled student varies widely from student to student? So the fact that you're saying we will allocate these funds according to the number of disabled students in the school districts for the current year, isn't that also going to result in inequalities? And if we don't use the 16% formula, what formula do you propose that we do use? Your Honor, I can tell you what I personally could recommend to the legislature or to the department in coming up with the formula that does not violate the ADA in 504. The court didn't analyze these questions. There's no evidence on these questions. So Your Honor is asking me questions outside of facts that I can point out to you. Your Honor, there are a number of ways that the legislature or DEP, Department of Education rather, could allocate this funding in a way that assures that the discrimination prohibited by these statutes doesn't happen. One way, instead of an actual child count per year. The argument raised at trial was an actual child count per year will result in lots of fluctuation every year. The state won't know how many students is in which district. They won't be able to predict how much money to give to which districts. Well, they could average it out, couldn't they? They could use a three-year or five-year average of actual enrollment and have some basis in reality such that students in districts, in all districts, get roughly an equal opportunity from the benefit the state is providing. And that's all that this case is about, is the benefit the state is providing. This case doesn't ask whether certain school districts discriminate or whether the federal government discriminates. It asks whether the state's benefit is given out in an unequal fashion. Your Honor, there are numbers of other ways they could do it. The state could subclassify among the disabled. Certainly it's not of record, but common sense would tell you that some disabilities are more expensive to treat. Or the education of children with certain disabilities is more expensive than the education of children with other disabilities. For instance, Down Syndrome versus Attention Deficit Disorder. I could imagine it may be cheaper to educate a student with Attention Deficit Disorder than it would with Down Syndrome. The court could come up with a program to distribute its billion dollars in special education funding in a way that accounts for those kinds of differences. And they could subclassify by severity of disability or type of disability. And then the student with ADD would have no complaint that he doesn't have access or equal access to the benefit that's provided to the student with Down Syndrome. How many? Because there are only two separate benefits. That would not discriminate in violation of these statutes. How many school districts are represented among the class of students and parents here? Your Honor, it's in the briefing. Is it 70-something? I believe it is. 71-something like that? I believe it is, Your Honor. What should we make of the fact that not a single school district sought to participate in this class action? I can't speculate, Your Honor. We didn't seek school districts to participate. They did not turn us down. Wouldn't you expect that inadequate funding and disparities that supposedly so severely impact on students would interest those formulating public policy in the local and state education field? That if the impact were as severe as your suit suggests, they would want to participate? Your Honor, there was testimony from school administrators, special education administrators, and a number of teachers. Your Honor has to remember that the discrimination that occurs because of this formula is a continuum of discrimination. You know, the more disability there is in a district, the less of the state's benefit those students are going to have available to them. But didn't the findings of the district court indicate that no testimony was offered that said a student was deprived of a service because of a funding issue? Isn't that what the caretakers and teachers testified to according to the finding of the district court? You have to remember, Your Honor, they must ensure that a free, appropriate public education is provided regardless of funding. Everyone in the world knows that it takes money to educate children. That's not nothing, is it? I mean, if they've met, realizing very clearly your theory here, but if there is no demonstration out there, and more importantly in the record, that there have been failures under the IDA specifically related to inadequate funding, shouldn't that say something to us? Not on the ADA and 504 discrimination claims, it should not. The ADA and 504 discrimination claims ask a different question. And the question is, does the state offer unequal shares of its benefit on the basis of disability? So you would detach from the actual impact on the ground, the effect of this disparity in funding. In other words, your position is it's perfectly appropriate to have a complete disconnect between the funding formula, which you see as discriminatory, and the actual delivery of services that are paid for by that funding stream. No, Your Honor, I would not say that that is my argument at all. Is that the logical extension of it? No, Your Honor, it is not. In fact, harm on the ground was found by the court in this case. To individual students? No, it is across the commonwealth. The trends are that students with less of this state's benefit because of the disability in their districts perform worse. They have greater dropout rates. They have fewer graduation to dropouts. Your Honor, the court found those harms to exist on the ground, and the court found a causal connection between those harms and the disparity in allocation of the state's benefit. Now, Your Honor, the court didn't even analyze the ADA and the 504 discrimination claims. If Your Honor searches the record, you'll find a lot more evidence than that, that there is harm on the ground that results from this. But the court's findings themselves support the conclusion that harm on the ground results from this disparity in the provisioning of the state's benefit. Now, just as the 14-day hospitalization was the benefit in Alexander v. Choate, just as that 14-day benefit was the relevant benefit in Alexander v. Choate, the SEF funding is the relevant benefit in this case. It's the state's benefit. That's the program they've created. And they must afford everyone who's eligible for that program, which is all special education students, not only meaningful access, but equal access to that benefit. And they have not, and it has resulted in harm. Mr. Quisenberry, we'll hear you on rebuttal, having afforded you an additional eight minutes. And we'll hear from the commonwealth. Thank you. Thank you, Your Honor. Mr. Kirkpatrick? Good morning, Your Honor. Good morning. Mr. Kirkpatrick, may I ask you also a question regarding Rule 23 practice here? And what was the nature of the process that occurred relative to class certification? May it please the Court? Absolutely, Your Honor. Yeah, what was it? I'm sorry, with regard to the class certification? The commonwealth challenged class certification. Yes, we did, Your Honor. This was a B-2 action? I believe so, Your Honor. It seeks injunctive relief, so I assume it's a B-2 action. And was there testimony taken? Was there evidence offered? There was a hearing, Your Honor, and I apologize. I'm trying to think back. This has been a case that has lasted a number of years. All right. I don't mean to give you a history lesson. I'm sorry. My curiosity is this. Ultimately at trial, who were the fact witnesses who testified for the plaintiffs here? The plaintiffs' case was mainly the parents. I'm trying to think how many of them actually testified. There was parents of six students. There was several teachers. There was their expert witness, Dr. Baker. There was an expert witness. Were these class representatives who testified? Yes, Your Honor. Well, they would have been parents of the class representatives, although it turned out that five out of the six students aren't actually in the class. Well, that's what I was going to ask. What did the district court ultimately determine with respect to the testimony of those parents and students? What I'm getting at here is I'm marveling at the fact that there's a certified class because I'm wondering if the same witnesses who testified at trial had been offered at the class certification stage with testimony offered, if this class ever would have been certified. I recognize that's an academic question, but the Third Circuit has a lot and has made a lot of the class action jurisprudence, especially in the certification area, and it stands out as a real curiosity to me on the face of the briefing because of what we're concentrating on. There was a question, Your Honor, about whether Redding, which is the school district for five of the six students, was in the class or out of the class, which goes to the point of there being no proof of flux. There is. Not even the plaintiffs, not even the appellants in this case, quite frankly, could keep their class straight because of the change in special education numbers. It turned out by the end of two weeks of evidence that, in fact, five out of the six students were not part of the class, and, in fact, two of the school districts out of the five that the parties focused on primarily were not part of the first class as well. And when I say class, I'm sorry if I'm being a little bit vague. I mean the first class that was certified and the class that is sort of at issue in this case. I don't want to take everybody down a rabbit hole here, but it was a great curiosity to me when I read it. Well, Your Honor, I think that that is sort of the problem with the appellant's case is a failure of proof. After two weeks of putting on testimony, they put on not a single person who had personal knowledge of the budgets who could say, yes, we're not able to offer a service or a program because we're not getting enough funding, and we're not getting enough funding because of how this funding formula works. So if we go back simply to the statute, the denial of a benefit, and we look at the funding allocation at 16 percent where you have some school districts with more than 16 percent and some school districts with less than 16 percent, it's your position that that is not per se a violation of the statute? That is correct, Your Honor. And the reason is because there was not a single bit of evidence that any child was being denied a service or program because of the way that is being allocated. I'll note that the 16 percent is not merely random. The court found in Finding a Fact 16 that a majority of children in Pennsylvania school districts reside in school districts that have about 15 percent. I mean, that's the tip of the bell curve, and it's a rather wide bell curve. It is also interesting to note that the federal government, in distributing IDEA-B money, also uses a census-based formula. So the notion that, and that is within the statute itself, the notion that Congress would pass a statute that violates the ADA, I think is indicative of the fact that this is trying to stretch ADA in rehabilitation discrimination and saying, okay, well, you must give every child the same exact amount of money, which goes directly contrary to the whole idea of IDEA, which is... Right. I mean, there's an individualized nature. That's the whole idea of an IEP. It's individual. We aren't talking about the IDEA, and we aren't talking about IEPs. We're talking about the Rehabilitation Act and the ADA. The IDEA provides a basic education, right? Now, there can be advantages beyond that. The fact that everyone, every disabled child has been provided with a FAPE does not mean that there aren't certain services beyond that that can be provided. Isn't that correct? That is correct, Your Honor. And if the funding for those additional services varies from district to district, how is that consistent with the anti-discrimination provisions of the ADA and the Rehabilitation Act? Well, Your Honor, because not only is it different for every district, it's different for every child. That is the very point of IDEAs. You could have two children... But we're not talking about IDEA. We're happy with IDEA. We've provided the FAPE. We're talking about what comes beyond that. And could you tell us what is beyond that? That was one direction I was going. In addition to IDEA benefits, which would be the IEP, what other services are being provided on the ground at the school district level, which might implicate the RA and the ADA? Or is a better FAPE being provided in some districts than it is being provided in other districts? No, Your Honor. I wouldn't say a better FAPE. Legally, that doesn't make much sense to say we have free public education and then some people have a better free public education. Now, I will note that the regulations of ADA provide Section 35130 that nothing in this part, nothing in these regulations prohibit a public entity from providing benefits, services, or advantages to individuals with disabilities or to a particular class of individuals with disabilities beyond those required. So the statutes themselves, or at least the regulations, acknowledge that some disabled children might be able to get more. But if you look at the facts in this case, the only special education director to testify that I saw better FAPE, as it were, was Deborah Hartman, who was a special education director for Allentown School District, which isn't a class district. That's one of the districts that is supposedly unfairly benefiting from this formula because it has less than 16% special education populations. Same thing with Redding, which, again, there's five of the six named plaintiffs attend Redding School District, and yet Redding, under appellant's theory, is unfairly benefiting from this funding formula. Appellant's counsel sort of argued that, well, the court didn't find, the court didn't find. It was appellant's burden of proof to put on evidence that there is a connection showing that this funding formula discriminates or causes a disparate impact or causes whatever their ultimate claim of relief is under these statutes. And I will note that I think it is an unfair characterization of the court's ruling to say that the court just blew these two claims off, that the court didn't at all review them under their standard. The court did, but the court recognized what this court recognized in June of this year in R.G. v. Downingtown Area School District, where this court affirmed the district court's ruling that because appellant's Section 504 claim is based on the same facts underlying the IDEA claim and the district court correctly concluded that the district's IEP was adequate, the Section 504 claim, and in that case also the IDEA claim, likewise failed. So you're not taking the position that if one has a free and appropriate education and therefore does not violate the IDEA, you could never recover under the Rehabilitation Act or the IDEA. Am I correct? That is correct, Your Honor. We are not taking the position that— And do you also read the district court as reading the law the same way? That is, they did not say because you failed on IDEA, you will necessarily fail on ADA and RA. Absolutely, Your Honor. In fact, the district court in page 56 of the opinion specifically says that. The court recognized there might be cases out there in which an IDEA violation did not occur but because of the unique facts of the case, an ADA or Rehabilitation Act violation occurred, but that wasn't this case. The appellant's argument, no matter how they're trying to characterize it now, has always been based upon the same facts and theories. And that's what the district court says. The district court says in her opinion that Section 504 and the ADA are closely related to the IDEA, citing a case of this court's, and then goes on to say that plaintiffs have presented a moving target of allegations regarding their 504 and ADA claims. The gravamen of their Section 504 and ADA claims, namely that they have been denied access to educational opportunities, are based on the same allegations and theories that underlie their IDEA claim. Absolutely, Your Honor. And I would note that in that footnote, the court shows that at the dispositive motion stage, the appellants even said that. That's, oh, well, we're bringing ADA and rehab under the same facts and theories as we have with the IDEA. So to lose and now try to come and say, oh, well, the court just completely missed the boat on this and just didn't understand what we were saying, I think is unfair. The district court in footnote 23 did say, here all claims of discrimination are based at their core on a denial of faith. That doesn't seem to be, to me, a correct reflection of what the appellants are saying here today. I would agree, Your Honor. I think the appellants have proffered a different claim than perhaps what they presented to the district court. But I would say that to the extent that they are making a facial challenge to say that you must give every single child the exact same amount of money or you violate the ADA, goes against, and I know I keep coming back to IDEA, but if that was true, IDEA would, on its face, violate the ADA. And the district court says at footnote 23, the court acknowledges that in some circumstances, a school can comply with the IDEA but fail to comply with the section 504 and the ADA. Absolutely, Your Honor. And then concluded, based upon its finding of fact, based upon the failure of proof, that this is not the case in which that occurred. That all of the claims were coming out of this idea that these students or a student or some student somewhere was being denied a program, a service, an opportunity because of this funding formula and the appellants failed to prove that. In every case, all of the complaints not only could not be connected or were not connected to this funding formula, but also the court noted in a different footnote, I'm sorry I don't have the page off the top of my head, in which the court said in nearly every case, when the parents complained about the problem, the school district fixed it. So it might not have been because of lack of funding, and in fact, every special education director that came up for these six school districts, five school districts, said, we don't think about funding. We know our obligation under IDEA, and when a student requires a service, we ignore the idea of funding, we provide that service. And the idea that this 4.8% of a school district, in class, school district's budget, somehow has kept a school district from providing any service is simply not found in the record. I have four minutes, or four seconds, so I will, unless you have questions. Well, now you have zero, but if you're finished, I have no questions, so thank you very much. Thank you, Your Honors. Oh, can I, I'm sorry, I know I'm out of time, but I just want to express my gratitude for rescheduling this, not only to Your Honors, but to opposing counsel. It was greatly appreciated. Thank you. Mr. Quisenberry. Yes, Your Honors. Several points, Your Honors. First thing to understand, there's nothing magic about 16%. Whether the school district is over or under, that's not some threshold that has significance. It is a continuum of discrimination. The more students with disabilities in the district, the fewer dollars each of those students is entitled to receive the benefit of. But isn't your burden to show that there are students being denied a benefit? Your Honor, there's a difference between being denied or excluded from the benefit and being given unequal access to the benefit. Your Honor, the district court didn't even cite the ADA, the 504 regulations. Access to the benefit? I mean, is that really what's alleged here? Yes, Your Honor. Access to the benefit, or are we talking about a benefit, the cost of which is uniform? It's Alexander versus Choate. It's meaningful and equal access to the benefit. But where have you demonstrated any denial of the benefit absolutely? There is no absolute denial of the benefit. All right. So there's no denial of the benefit at all. It's just that your contention has to be somehow that the quality of the benefit, by virtue of fewer available monies per child, is somehow less than the quality of the benefit provided where there is more money available. Your Honor, the court did make those findings and drew a causal connection based on Dr. Baker's testimony that that occurs statewide as a result of this formula. But, Your Honor, I would direct your attention. What finding are you referring to? Findings 62 through 68 or 69. Are those all the findings on the test performance? No. No, Your Honor, they're the findings on the way that the formula works and what the result of that is, Your Honor. And then the court goes on to find harms on the ground. Well, that just tells us that there's difference per student averages. But that doesn't show a connection between those dollars allocated to the students and their ability to access a program. There's nothing in the record that says they're not able to do so. No witness from the findings of fact of the court suggested that they were being deprived of ability to do that. Nor does it make any finding that they have been denied a benefit or that they have been denied, in your words, access to a benefit. Your Honor, the benefit is the... Your Honor, the state's benefit is the special education funding. And the ADA regulations and the 504 regulations are very clear that in distributing a state's funding, it may not do so in a manner that affords a qualified individual, which is, in this case, every student, with an opportunity to participate in or benefit from that benefit that is not equal to that afforded others. It cannot provide a qualified individual with a benefit that is not as effective in affording an equal opportunity to obtain the same result, gain the same benefit, or to reach the same level of achievement as that provided to others. But the difference isn't because of their disabling condition. It's because of where they go to school, isn't it? It's absolutely not. The discrimination occurs because of the rate or frequency of disability, not because of where they live. The more disability there is in a district, the less benefit they get under this formula. So less opportunities are available to them with the money that comes to them from this formula. So it's because of the population with whom they are educated. It's because of the concentration of disability in the district. It's on the basis of concentration of disability in the district or frequency of disability in the district, not on what type of disability they have, severe or less severe, but the fact that the more disability there is in the district, the less of the state's benefit those students may benefit from. Your Honor, the IDEAB... Well, your time is up. We gave you eight more minutes in your original argument and you spore now in rebuttal. Thank you, Your Honor. Thank you very much. Thank you to both sides for very excellent and very effective arguments, effective in the sense of really, I know, helping me to understand the case much better than I did coming here. Thanks very much. Thank you. I'll ask the clerk to recess the proceedings. Please rise. The court stays in recess.